Filed 6/24/26; Opinion following transfer from Supreme Court

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| In re J.L. et al., Persons Coming Under the Juvenile Court Law. | |
| THE PEOPLE, Plaintiff and Respondent, v. J.L. et al., Defendants and Appellants. | A171588 (Marin County Super. Ct. Nos. JJ0000003, JJ0000004) |

In 2024, a juvenile court found four co-offenders jointly and severally liable for victim restitution in the amount of $15,850.54.  Two of the minors subject to the victim restitution orders, J.L. and O.V., appeal.  Both minors argue there was insufficient evidence to support a small portion of the victim restitution amount intended to compensate the victim's mother for childcare expenses, although they disagree on the precise amount by which the restitution order should be reduced.  J.L. asks for a reduction of $730, and O.V. asks for a reduction of $205.  We find no error in the amount of victim restitution set by the juvenile court.

In addition, J.L. and O.V. contend they are entitled to apportionment among the four co-offenders of the restitution amount.  Effective January 1,

1

2025, the Legislature amended Welfare and Institutions Code[1] section 730.6 to eliminate joint and several liability for victim restitution in juvenile delinquency matters. (§ 730.6, subd. (b)(3), as amended by Stats. 2024, ch. 805, § 6; see Legis. Counsel's Dig., Assem. Bill No. 1186 (2023–2024 Reg. Sess.).) J.L. and O.V. claim the newly amended statute operates retroactively, and they therefore seek remand to allow the juvenile court to apportion restitution liability among the four co-offenders based on each offender's percentage of responsibility pursuant to the current version of section 730.6.

In our prior opinion in this matter filed on December 23, 2025, we concluded the new amendment to section 730.6 applies prospectively only and, therefore, does not apply to J.L. and O.V. Our Supreme Court granted review and transferred the matter back to us with directions to vacate our decision and reconsider the cause in light of *Ellingburg v. United States* (2026) 607 U.S. 163 (*Ellingburg*). We have considered *Ellingburg* and conclude, as we did in our previous opinion, that the Legislature intended the new amendment to section 730.6 to operate prospectively.

Accordingly, we affirm.

**FACTUAL AND PROCEDURAL BACKGROUND**

*J.L. (Juvenile Court Case No. JJ0000003)*

On June 20, 2023, the Marin County District Attorney filed a juvenile wardship petition (§ 602), alleging J.L. possessed or controlled child pornography (Pen. Code, § 311.11, subd. (a); count 1), a misdemeanor. On October 25, 2023, the juvenile court granted J.L. diversion, placing him on informal supervision pursuant to section 654.2. J.L. successfully completed

---

[1] Further undesignated statutory references are to the Welfare and Institutions Code.

2

informal supervision, and on August 14, 2024, the court dismissed the wardship petition.

*O.V. (Juvenile Court Case No. JJ0000004)*

On June 20, 2023, a juvenile wardship petition was also filed against O.V. It was alleged that O.V. committed sexual battery upon victim Jane Doe (Pen. Code, § 243.4, subd. (e)(1); count 1), a misdemeanor.

On November 1, 2023, O.V. and the district attorney reached an agreement. The petition was amended to allege false imprisonment of Jane Doe (Pen. Code, § 236; count 2), a misdemeanor; O.V. admitted the allegations of count 2; and count 1 was dismissed.[2] The juvenile court placed O.V. on non-wardship probation for six months. On August 14, 2024, the court ordered the non-wardship supervision terminated successfully.

*Restitution*

On March 27, 2024, the probation department filed a victim request for restitution of $15,850.54, consisting of $3,850 for "[b]abysitting and transport services for the two younger children" (i.e., Doe's younger siblings), $3603 for Doe's mother's (Mother's) lost wages from her employment with one of her employers, $4,740 for Doe's lost wages from her employment with an employer, and $3,657.54 for Mother's lost wages from her employment with another employer. Attached to the memo were written statements from Doe's employer and Mother's employer regarding their missed work due to Doe's therapy and Mother's need "to take care of legal meetings for her daughter." A letter from Mother's employer listed 22 dates Mother missed her scheduled

---

[2] Because the facts of the offenses are not relevant to the appeal, we do not recount them here. It is sufficient to note that J.L., O.V., and two co-offenders (minors with related juvenile court cases, Nos. JJ0000001 and JJ0000002) were involved in an incident with victim Jane Doe.

shifts and an additional five dates when Mother arrived late or left early "to accommodate meetings" related to her daughter.

At a hearing on April 24, 2024, the parties requested a contested hearing on restitution.

On June 14, 2024, the district attorney filed points and authorities in support of the victim restitution claim against J.L., O.V., and their two co-offenders, which included a memo documenting Mother's statements to an advocate in the district attorney's office. Mother explained she had four children, two of whom were under 10 years old. After the incident with the four co-offenders, Doe had multiple episodes of mental health crisis that required Mother to stay with Doe. When Doe had a mental health crisis, Mother needed a babysitter to pick up the two younger children from school, look after them, and cook them dinner. Mother reported that she paid the babysitters $60 per child per session ($120), plus $25 for food if she had not left food ready for the children. Mother could not "pinpoint exact dates as she was dealing with a lot during that time."[3]

_____

[3] The attached memo documented a two-and-a-half hour long meeting on May 2, 2024, between the district attorney advocate and Mother regarding the victim restitution claim. Mother could identify a few dates in May through July 2023 on which specific events occurred such as when she accompanied Doe to a law enforcement interview, when she had to stay at home with Doe "due to relentless bullying in school" related to the offenses, when she had to hire a babysitter to go to work because Doe was "not in a good mental space to baby sit her own siblings," when she took Doe to therapy sessions, and when she attended a court hearing and met with a victim advocate. For other instances, Mother "could not remember specific details," although she reported needing to be home with Doe during periods in July 2023 and in August 2023; she "was juggling a lot between her 4 children [and Doe's] mental health crisis . . . [and] was not attentive on what occurred on which date."

4

At the contested hearing on June 26, 2024, J.L.'s attorney objected to the claim for childcare expenses, arguing there was "no documentation," "not even a breakdown as to constituent dates." O.V.'s attorney stated that seven dates had been identified "with both date and reason for the need for childcare," but "[t]he other dates are vague, not given at all."

The prosecutor responded that it was understandable Mother could not remember specific dates she needed babysitting because "things were very chaotic at that time," and the request was "not an inappropriate number" given that it covered a period of at least seven months in 2023.

After hearing the attorneys' arguments, the court stated it would "give the People an opportunity to supplement their exhibits and substantiate the requests for the amounts."

On July 25, 2024, the district attorney filed supplemental points and authorities in support of the victim restitution claim against J.L., O.V., and their two co-offenders, which included further statements from Mother regarding restitution. Mother explained that, prior to the incident with minors and their co-offenders, Doe assisted in looking after the two younger children, but after Doe started showing signs of mental health struggles, Mother decided it was not safe for Doe to babysit, and she had to hire babysitters. One of the babysitters Mother hired provided a written statement. The babysitter wrote that she worked for Mother on certain days from May through October 2023. She worked from 8:00 a.m. to 3:30 or 4:00 p.m. She cooked breakfast and prepared a snack and was paid $75 per child per day. When Mother could not give the babysitter a ride home, Mother also paid for her return transportation.

The next hearing on restitution was held August 14, 2024. J.L.'s attorney argued there was insufficient detail to award any restitution. O.V.'s

5

attorney argued Mother could have "looked through her own records to provide" dates when she paid for babysitting.

The juvenile court ordered that J.L., O.V., and their two co-offenders were jointly and severally liable for restitution of $15,850.54, finding the People met their burden of establishing the victim restitution amount requested by a preponderance of the evidence.

Minors timely appealed the restitution order.

## DISCUSSION

A.    *Victim Restitution for Childcare Expenses*

    1.    <u>Applicable Law and Standard of Review</u>

"[R]estitution is a victim's right in juvenile delinquency cases," (*In re Scott H.* (2013) 221 Cal.App.4th 515, 523), and "victim" for purposes of restitution includes family members of a victim of a crime or delinquent act (*id.* at p. 522). "An order of direct victim restitution acts to make the victim whole, rehabilitate the minor, and deter future delinquent behavior," and a victim's right to restitution is to be construed broadly and liberally. (*Luis M. v. Superior Court* (2014) 59 Cal.4th 300, 305.) The court "need not ascertain the exact dollar amount of the [victim]'s losses," but the calculation "must have some factual nexus to the damage caused by the minor's conduct." (*Id.* at p. 309.)

We review an order for victim restitution for abuse of discretion. (*In re Johnny M.* (2002) 100 Cal.App.4th 1128, 1132.) " ' "When there is a factual and rational basis for the amount of restitution ordered by the trial court, no abuse of discretion will be found by the reviewing court." ' " (*Ibid.*) We review a claim of insufficiency of the evidence to establish the amount awarded for substantial evidence. (*In re Travis J.* (2013) 222 Cal.App.4th 187, 203.) No particular type of proof is required, and a court may accept a

6

victim's unsworn statement about the amount of loss a minor's delinquent acts caused. (See *People v. Pittman* (2024) 99 Cal.App.5th 1252, 1260 ["depending on the circumstances and as a matter of discretion, a trial court may find a victim estimate is sufficient to make a prima facie showing of loss, subject to rebuttal by the defendant"]; *People v. Gemelli* (2008) 161 Cal.App.4th 1539, 1543 [no "particular kind of proof" is required; "the trial court is entitled to consider the probation report, and, as prima facie evidence of loss, may accept a property owner's statement made in the probation report about the value of stolen or damaged property"].) "Once the victim makes a prima facie showing of economic losses incurred as a result of the [minor's delinquent] acts, the burden shifts to the [minor] to disprove the amount of losses claimed by the victim." (*People v. Gemelli*, at p. 1543.)

2.    Analysis

Minors' challenge to the restitution amount is very limited. They do not question the amount ordered for lost wages ($12,000.54), and they agree Mother is entitled to restitution for babysitting expenses she incurred because she was taking care of Doe. Minors' appellate claim involves only a small portion of the restitution amount intended to compensate Mother for these childcare expenses.

J.L. concedes the record adequately establishes 26 days when Mother "was likely to have utilized childcare."[4] Relying on Mother's statement that

---

[4] J.L. concedes the record contains adequate evidence of 22 identified dates when Mother missed work, in J.L.'s words, "purportedly to take care of matters related to the offense inflicted on her daughter" and four additional dates when Mother (again, we quote J.L.) "was engaged in some type of activity like accompanying Doe to court or her therapy sessions, or staying home with Doe during a mental health crisis that necessitated the hiring of a babysitter." J.L. does not think babysitting costs are warranted for days when Mother worked a partial shift.

7

she paid babysitters $120 per day (and ignoring her further statement that she sometimes paid an additional $25 for food), he argues restitution for childcare must be limited to $3,120 ($120 multiplied by 26); that is, J.L. seeks a reduction of $730.

Initially in his opening brief, O.V. accepted that Mother was entitled to babysitting expenses for 32 days, but he argued she should recover expenses at a rate of $97.50 per day, for a total of $3,120.[5] In his reply brief, O.V. changes position, claiming Mother is entitled to expenses for 27 days[6] at a rate of $135 per day, for a total of $3,645, a reduction of $205.

We are not persuaded by minors' arguments. Mother requested $3,850 for childcare expenses she incurred over many months because she had to attend to the consequences of the offenses against her daughter. Mother explained why she needed to hire babysitters, including that Doe was no longer able to babysit her younger siblings. The juvenile court acted within its discretion in accepting Mother's estimate as "a prima facie showing of loss." (*People v. Pittman, supra*, 99 Cal.App.5th at p. 1260.)

Mother was not required to identify each date she paid for childcare. The purpose of restitution is "to make the victim whole." (*Luis M. v. Superior Court, supra*, 59 Cal.4th at p. 305.) The court was not required to "ascertain the exact dollar amount of the [victim]'s losses" so long as the amount had "some factual nexus to the damage caused by the minor's conduct." (*Id.* at p.

---

[5] O.V.'s reached this rate by taking an average of $120 and $75. In his reply brief, however, O.V. acknowledges that he had been mistaken about what the evidence showed. Mother said she paid $120 per day, plus $25 for food, and one of her babysitters wrote that she was paid $150 per day ($75 *per child*).

[6] O.V. does not explain why he changed his calculation from 32 days in his opening brief to 27 days in his reply brief.

309.)  But, in any event, the evidence documents 30 specific dates when Mother needed to hire a babysitter,[7] and Mother expended at least $120, and sometimes more than $150, for each day of babysitting.  This is more than enough evidence to support Mother's request for $3,850 for childcare expenses.

B.      *Whether the New Law on Victim Restitution Operates Retroactively*

        1.      Background and Legal Principles Regarding Retroactivity

At the time the juvenile court ordered victim restitution in these matters, the court was permitted to order joint and several liability for victim restitution among co-offenders.  (See *In re S. S.* (1995) 37 Cal.App.4th 543, 550–551 [affirming minor's restitution obligation that was joint and several with a co-offender where "both juveniles were fully responsible for the victim's losses"]; former § 730.6, subd. (h)(2), as amended by Stats. 2015, ch. 131, § 1 [contemplating restitution orders that identify "co-offenders who are jointly and severally liable for victim restitution"].)

Effective January 1, 2025, however, the Legislature eliminated joint and several liability for victim restitution in juvenile delinquency matters. Assembly Bill No. 1186 (2023–2024 Reg. Sess.) (Assembly Bill 1186) added paragraph (3) to section 730.6, subdivision (b) (section 730.6(b)(3)), which now provides: "For the purposes of victim restitution, each minor shall be held severally liable, and shall not be held jointly and severally liable as co-offenders.  The court shall apportion liability based on each minor's percentage of responsibility or fault for all economic losses included in the

---

[7] Mother's employer listed 27 specific dates when she either missed work altogether or missed part of her shift to attend to Doe, and Mother identified three additional specific dates when she had to deal with matters related to the juvenile court case or Doe's mental health.

order of restitution.  The aggregate amount of apportioned liability for all minors involved shall not exceed 100 percent in total."

"[W]hether a statute is to apply retroactively or prospectively is, in the first instance, a policy question for the legislative body which enacts the statute." (*Evangelatos v. Superior Court* (1988) 44 Cal.3d 1188, 1206 (*Evangelatos*).)  "[T]o determine if a law is meant to apply retroactively, the role of a court is to determine the intent of the Legislature."  (*People v. Superior Court (Lara)* (2018) 4 Cal.5th 299, 307.)

"Ordinarily, statutes are presumed to apply only prospectively, unless the Legislature expressly declares otherwise.  This well-settled principle is codified at section 3 of the Penal Code and appears in other codes as well. (See, e.g., Code Civ. Proc., § 3; Civ. Code, § 3.)" (*People v. Burgos* (2024) 16 Cal.5th 1, 7–8 (*Burgos*).)  "This rule has been repeated and followed in innumerable decisions." (*Evangelatos*, *supra*, 44 Cal.3d at p. 1207.)

"In *In re Estrada* (1965) 63 Cal.2d 740 (*Estrada*), however, [the California Supreme Court] held that an amendment to a statute that lessened punishment for a crime gave rise to an inference of contrary legislative intent; that is, that the Legislature must have intended that the amendment mitigating punishment would apply retroactively to every case to which it constitutionally could apply." (*Burgos*, *supra*, 16 Cal.5th at p. 8.) Our high court in *Estrada* reasoned: "When the Legislature amends a statute so as to lessen the punishment it has obviously expressly determined that its former penalty was too severe and that a lighter punishment is proper as punishment for the commission of the prohibited act.  It is an inevitable inference that the Legislature must have intended that the new statute imposing the new lighter penalty now deemed to be sufficient should apply to every case to which it constitutionally could apply.  The amendatory act

imposing the lighter punishment can be applied constitutionally to acts committed before its passage provided the judgment convicting the defendant of the act is not final. This intent seems obvious, because to hold otherwise would be to conclude that the Legislature was motivated by a desire for vengeance, a conclusion not permitted in view of modern theories of penology." (*Estrada*, at p. 745.)

Recently, our high court stressed *Estrada*'s " ' limited role' " in interpreting statutes, explaining, "*Estrada* informs the application of the default rule 'in a specific context by articulating the reasonable presumption that a legislative act mitigating the punishment for a particular criminal offense is intended to apply to all nonfinal judgments.' " (*Burgos, supra*, 16 Cal.5th at p. 14.) *Estrada* does not apply "to statutes that, although arguably lessening punishment in some sense, d[o] not implicate the central rationale behind the *Estrada* inference." (*Ibid*., citing *People v. Brown* (2012) 54 Cal.4th 314, 321 [statute that increased rate local prisoners could earn conduct credits applied prospectively only].)

    2.    <u>Analysis</u>

Relying on *Estrada*, J.L. and O.V. contend they are entitled to the retroactive benefit of section 730.6(b)(3) because the victim restitution orders are not yet final on appeal. The Attorney General responds that the Legislature intended section 730.6(b)(3) to apply prospectively only.

In determining whether the Legislature intended the new law to apply retroactively, we begin with the observation that Assembly Bill 1186 does not contain an express retroactivity provision. "With no 'express declaration of retroactivity or a clear and compelling implication that the Legislature intended' to apply the statute retroactively," we presume section 730.6(b)(3)

11

"operates prospectively unless the statute 'lessen[s] . . . punishment' within the meaning of *Estrada*." (*Burgos*, *supra*, 16 Cal.5th at p. 20.)

Next, we note the Legislature has generally provided two different kinds of restitution: (1) restitution *fines* and (2) direct restitution *to the victim*. (*People v. Holman* (2013) 214 Cal.App.4th 1438, 1451; see Pen. Code, § 1202.4, subd. (b) ["In every case where a person is convicted of a crime, the court shall impose a separate and additional restitution *fine . . .*" (italics added)], subd. (a)(1) ["It is the intent of the Legislature that a victim of a crime who incurs an economic loss as a result of the commission of a crime shall receive restitution directly from a defendant convicted of that crime].")[8] Courts have recognized the purpose of "a restitution fine is punishment. [Citation.] The purpose of direct victim restitution, however, is to reimburse the victim for economic losses caused by the defendant's criminal conduct, i.e., to make the victim reasonably whole," while "[s]econdary goals of direct restitution include rehabilitation of the defendant and deterrence of future criminality." (*People v. Holman,* at pp. 1451–1452.)

---

[8] In the context of juvenile offenders, section 730.6 previously provided for analogous restitution *fines* and direct restitution *to victims*. However, Assembly Bill 1186 eliminated restitution fines for minors. (§ 730.6, subd. (a)(2) ["The court shall not impose a separate and additional restitution fine against a minor found to be a person described in Section 602."]; compare former § 730.6, subd. (b)(1), as amended by Stats. 2015, ch. 131, § 1 ["If a minor is found to be a person described in Section 602, the court shall impose a separate and additional restitution fine"].) There are no restitution fines at issue in this appeal. Assembly Bill 1186 did not eliminate direct restitution to compensate victims. Section 730.6, subdivision (a)(1), provides, "It is the intent of the Legislature that a victim of conduct for which a minor is found to be a person described in Section 602 who incurs an economic loss as a result of the minor's conduct *shall receive restitution directly from that minor*." (Italics added.)

J.L. and O.V. acknowledge that California courts generally do not view victim restitution—as opposed to a restitution fine—as punishment. (See *People v. Evans* (2019) 39 Cal.App.5th 771, 776 [noting courts "have explained that victim restitution is intended 'as a civil remedy rather than a criminal punishment' "]; *People v. Kunitz* (2004) 122 Cal.App.4th 652, 657 [in contrast to a restitution fine, which "is punishment, and thus must relate to the defendant's individual culpability," "[v]ictim restitution is not punishment"]; *People v. Harvest* (2000) 84 Cal.App.4th 641, 647 (*Harvest*) ["unlike a fine, victim restitution is not expressly and statutorily defined as punishment"].)[9] Minors nonetheless argue that we should apply the *Estrada* presumption of retroactivity because the victim restitution orders *are* punishment in some fundamental or constitutional sense.

Both minors also rely on legislative analysis for Assembly Bill 1186, quoting a comment that the elimination of joint liability "is intended to address situations where one minor has complied with their portion of

---

[9] In *Harvest*, Division Four of this court held that double jeopardy protections do not prohibit ordering victim restitution for the first time at a resentencing because victim restitution "is not punishment." (*Harvest*, *supra*, 84 Cal.App.4th at p. 645.) The *Harvest* court explained that, while the purposes of criminal law include "punishing criminality already committed," "the primary purpose of victim restitution is to provide monetary compensation to an individual injured by crime," and "[c]ompensation is the defining feature of civil law." (*Id*. at p. 648.) The court recognized that a consequence may " 'be " 'so punitive either in purpose or effect' [citation] as to 'transfor[m] what was clearly intended as a civil remedy into a criminal penalty,' " ' " but an order of victim restitution for economic loss does not amount to such a criminal penalty for double jeopardy purposes. (*Id*. at pp. 649–650.) In *People v. Millard* (2009) 175 Cal.App.4th 7, 35, a claim that victim restitution had to be determined by a jury beyond a reasonable doubt under the Sixth Amendment failed because the Court of Appeal rejected the premise that "victim restitution increases the punishment for a crime."

restitution owed but may still be held liable for the other co-offenders who have not paid their portion." (Sen. Comm. on Pub. Safety, Analysis of Assem. Bill No. 1186 (2023-2024 Reg. Sess.) July 2, 2024, p. 6.) J.L. and O.V. then assert that, in such situations (i.e., when a minor has paid his "portion" of victim restitution but is still liable to the victim for amounts co-offenders have not paid), joint liability results in "*punishing* one minor more than the others even when that minor's culpability was less." (Italics added.)

Thus, minors frame the issue as whether victim restitution is punishment, because if victim restitution is punishment, then the new law must be retroactive under *Estrada*. (*Burgos*, *supra*, 16 Cal.5th at p. 20.) But our more fundamental task is to try to ascertain legislative intent. At bottom, the default presumption that statutes operate prospectively and the contrary *Estrada* inference of retroactivity for laws that lessen punishment are rules of statutory interpretation meant to help us determine what the Legislature actually intended. (See *People v. Frahs* (2020) 9 Cal.5th 618, 627, (*Frahs*) ["Courts look to the Legislature's intent in order to determine if a law is meant to apply retroactively"].) In other words, the issue is not whether victim restitution is or is not criminal punishment for constitutional purposes; the issue is what the Legislature intended when it changed the law on victim restitution for minors.

Here, the legislative history cited by minors demonstrates the Legislature intended section 730.6(b)(3) to operate prospectively. The report from the Senate Committee on Public Safety on Assembly Bill 1186 that both minors quote provides: "AB 1186, as amended, provides meaningful relief from our broken restitution system to adjudicated youth in California by," among other things, "*[p]rospectively* ending joint and several liability for youth co-defendants." (Sen. Comm. on Pub. Safety, Analysis of Assem. Bill

14

No. 1186 (2023-2024 Reg. Sess.) July 2, 2024, p. 4, italics added.) Thus, the Legislature understood Assembly Bill 1186's proposed change to the rules on victim restitution would apply prospectively only. Because the Legislature did not subsequently amend the bill to specify the end of joint liability would apply retroactively, we infer the Legislature intended that the change to the law of victim restitution would operate prospectively only.

J.L. argues the report's description of the effect of Assembly Bill 1186 as prospective is "not adequate indication" of the Legislature's intent to "overcome the *Estrada* presumption." (Capitalization omitted.) This argument presupposes that *Estrada*'s inference of retroactivity applies. But *Estrada* is based on the reasoning "that the Legislature must have intended that the amendment *mitigating punishment* would apply retroactively to every case to which it constitutionally could apply." (*Burgos*, *supra*, 16 Cal.5th at p. 8, italics added.) If the Legislature itself did not consider victim restitution to be punishment, then the *Estrada* inference should not apply.

As we have described, in California, victim restitution has generally been recognized to be a civil remedy, not punishment. (E.g., *People v. Evans*, *supra*, 39 Cal.App.5th at p. 776 ["victim restitution is intended 'as a civil remedy rather than a criminal punishment' "]; *People v. Kunitz*, *supra*, 122 Cal.App.4th at p. 657 ["Victim restitution is not punishment"].) "[T]he Legislature 'is deemed aware of existing laws and judicial constructions in effect at the time legislation is enacted.' " (*Frahs*, *supra*, 9 Cal.5th at p. 634.) We therefore presume that, when it enacted Assembly Bill 1186, the Legislature was aware of the distinction between restitution fines (intended as punishment) and victim restitution (intended as a civil remedy to compensate crime victims for their economic losses). Indeed, in this case, we need not rely solely on this presumption. The legislative history

15

demonstrates the Legislature did know the difference between restitution fines and victim restitution. A committee report on Assembly Bill 1186 that both minors cite includes a section titled "Victim Restitution vs. Restitution Fines" that explains, "The imposition of a restitution fine is to inflict additional punishment," while "[t]he purpose of victim restitution is to reimburse the victim for economic loss cause by the crime." (Sen. Comm. on Pub. Safety, Analysis of Assem. Bill No. 1186 (2023-2024 Reg. Sess.) July 2, 2024, p. 4.)[10]

_____

[10] In his reply brief, J.L. cites *People v. Brown* (2007) 147 Cal.App.4th 1213, for the first time. In *Brown*, the defendant entered a plea agreement that improperly included a provision limiting the amount of victim restitution. (*Id.* at pp. 1218, 1226 ["Victim restitution may not be bargained away by the People"].) After the trial court ordered the defendant to pay over $34,000 in victim restitution, contrary to the agreement, the defendant appealed, seeking specific performance of the improper provision limiting the amount of victim restitution that could be awarded. (*Id.* at p. 1217.) The Court of Appeal held the defendant was *not* entitled to specific performance but concluded she should be given the opportunity to withdraw her plea because, for purposes of Penal Code section 1192.5, "the trial court imposed a punishment more severe than that specified in her plea agreement." (*Ibid.*) The *Brown* court reasoned that "if the restitution fine is considered punishment for purposes of section 1192.5, then victim restitution is likewise considered punishment for purposes of that section" because "the effect on the defendant is the same," whether the award is a fine or for victim restitution. (*Id.* at p. 1222.) Yet the court acknowledged "victim restitution does not constitute punishment" in other contexts. (*Ibid.*, citing *Harvest*, *supra*, 84 Cal.App.4th 641.) We do not find *Brown* helpful to the issue before us in this appeal. Our high court has explained that *Estrada* does not apply "to statutes that, although arguably lessening punishment in some sense, d[o] not implicate the central rationale behind the *Estrada* inference." (*Burgos*, *supra*, 16 Cal.5th at p. 14.) Here, the *Estrada* inference does not apply because the legislative history shows the Legislature understood that victim restitution is not punishment. It does not matter that, in a different context, the elimination of joint liability for victim restitution might be viewed as "arguably lessening punishment in some sense." (*Burgos*, at p. 14.)

16

We further presume the Legislature was aware of *Evangelatos*, *supra*, 44 Cal.3d 1188, cited by the Attorney General. In *Evangelatos*, the California Supreme Court considered a voter approved measure that modified traditional joint and several liability by "limiting an individual tortfeasor's liability for noneconomic damages to a proportion of such damages equal to the tortfeasor's own percentage of fault." (*Id.* at p. 1192.) The court held the new law did not apply to claims that accrued before the measure's effective date, relying on the "widely recognized legal principle . . . that in the absence of a clear legislative intent to the contrary statutory enactments apply prospectively." (*Id.* at pp. 1193–1194.)

Based on the foregoing authority, we infer that, when Assembly Bill 1186 was enacted, the Legislature did not view direct victim restitution as punishment and, consequently, it did not intend Assembly Bill 1186's change in how victim restitution is awarded to implicate *Estrada*. Rather, the Legislature expected that such a change would operate prospectively under the default rule (as happened in *Evangelatos*), unless it expressly specified otherwise.

In sum, we conclude section 730.6(b)(3) operates prospectively both because the Legislature did not expressly provide otherwise and because the legislative history shows the Legislature understood that the law would apply prospectively.

Our Supreme Court has directed us to reconsider the matter in light of *Ellingburg*, *supra*, 607 U.S. 163. In *Ellingburg*, the defendant was ordered to pay restitution to his victim pursuant to the Mandatory Victim Restitution Act of 1996 (MVRA) although he committed his crime *before* the enactment of the MVRA. (*Id.* at pp. 164–165.) The defendant argued the restitution obligation violated the ex post facto clause, and the United States Attorney

17

General and the United States Supreme Court agreed.[11] The Court explained, "When determining whether a law violates the Ex Post Facto Clause, the Court must evaluate whether the law imposes a criminal or penal sanction as opposed to a civil remedy. . . . [¶] Here, the statutory analysis is straightforward: Restitution under the MVRA is plainly criminal punishment for purposes of the Ex Post Facto Clause." (*Id.* at pp. 165–166.)

*Ellingburg*, *supra*, 607 U.S. 163, which was decided after the Legislature enacted Assembly Bill 1186, does not change our analysis. We have concluded the Legislature did not intend Assembly Bill 1186 to apply retrospectively based on legislative history and our determination of the Legislature's understanding about victim restitution when it passed the law in 2024. At that time, it was well-recognized in California that direct restitution to the victim is a civil remedy, *not* criminal punishment. Consequently, we have concluded that the *Estrada* presumption of retroactivity does not apply. That the United States Supreme Court later held that an order to pay victim restitution—made pursuant to an entirely different statutory scheme—is criminal punishment for purposes of the ex post facto clause does not change our analysis of the Legislature's intent when it enacted Assembly Bill 1186.

Again, the issue in this appeal is not whether victim restitution constitutes criminal punishment for constitutional purposes. The issue is what the Legislature intended when it changed the law on victim restitution for minors. Based on the legislative history and the case law at the time the law was passed, we believe the Legislature intended Assembly Bill 1186 to

---

[11] " '[T]he ex post facto clauses of the state and federal Constitutions are "aimed at laws that 'retroactively alter the definition of crimes or increase the punishment for criminal acts.' " ' " (*People v. Alford* (2007) 42 Cal.4th 749, 755.) There is no ex post facto issue in the present appeal.

18

apply prospectively.  Accordingly, J.L. and O.V. are not entitled to retroactive application of the law.

## DISPOSITION

The judgment is affirmed.

_____
Miller, J.

WE CONCUR:


_____
Stewart, P.J.


_____
Richman, J.


A171588, *People v. J.L., et al.*

20

Trial Court:  Superior Court of Marin County


Trial Judge:  Hon. James T. Chou


Eileen Manning-Villar, under appointment by the Court of Appeal, for Defendant and Appellant J.L.


Heather E. Shallenberger, under appointment by the Court of Appeal, for Defendant and Appellant O.V.


Rob Bonta, Attorney General; Lance E. Winters and Charles C. Ragland, Chief Assistant Attorneys General; Jeffrey M. Laurence, Assistant Attorney General; Eric D. Share and Shannon Chase, Deputy Attorneys General, for Plaintiff and Respondent


A171588, *People v. J.L., et al.*